COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-288-CV

 

 

IN THE INTEREST OF L.D.K., M.L.P.,
S.D.P., AND D.E.P.                            

 

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

 

I. Introduction








This appeal follows an order
terminating the parental rights of Appellants Michael P. and Stacy K.  Michael argues that the trial court erred by
denying his motion for extension, that the evidence is legally and factually
insufficient to support the trial court=s finding that he engaged in culpable conduct under section 161.001(1)
of the Texas Family Code, and that the evidence is factually insufficient to
support the trial court=s finding
that the termination of his parental rights is in the best interest of L.D.K.,
M.L.P., S.D.P., and D.E.P. (collectively, Achildren@).  Stacy argues that the evidence is legally and
factually insufficient to support the trial court=s finding that the termination of her parental rights is in the
children=s best interest.  We will
affirm.

II. Factual and Procedural Background

Stacy and Michael are the
parents of the children at issue in this case and have lived together since
1995.  At the time of trial, L.D.K. was
ten years= old, M.L.P.
was nine years= old, S.D.P.
was six years= old, and
D.E.P. was one year old.

In 2001, when the family
lived near Harris County, CPS removed the children, except for D.E.P.,[2]
when S.D.P. tested positive for cocaine after birth.  Stacy admitted to using cocaine a Acouple of weeks each month@ during her pregnancy with S.D.P. Stacy and Michael both completed
substance abuse programs for drugs and alcohol, respectively, and in July 2002,
CPS returned the children to live with Stacy and Michael.  Stacy relapsed two years later, and Michael
began drinking again within three years of his rehabilitation.  Then, sometime in 2005 after Stacy relapsed,
Michael also began using cocaine.








In September 2005, when
Hurricane Rita hit Harris County, the family lost its trailer home and
eventually moved to Tarrant County. 
Neither Stacy nor Michael has held a stable job since moving to Tarrant
County.  Stacy stated that she had not
worked anywhere since moving to Tarrant County. 
Michael worked a few odd jobs in the time between when the family moved
and when the children were removed, but his main income has been a Supplemental
Security Income (SSI) disability check that he receives for injuries he
suffered while performing a plumbing job. 
Stacy admitted that the couple used a portion of this monthly SSI check
to pay for drugs.

While in Tarrant County, the
family has lived in four hotels, which FEMA temporarily paid for, and at times,
the family lived in shelters.  Stacy
stated that the family would stay in shelters for free for seven days and then
leave once the shelter required payment. 
Stacy also testified that she had to use L.D.K.=s, M.L.P.=s, and
S.D.P.=s SSI checks that they received for various medical issues to pay for
the hotel rooms.  Because she was
spending the money on hotel rooms, Stacy was unable at times to buy the
appropriate medicine for the children.








On October 10, 2006, Stacy
and D.E.P. checked into the Arlington Life Shelter to allow Michael time and
space to move the family into an apartment. Stacy left the other three children
with Michael because she was unable to control all the children at the
shelter.  The shelter required Stacy to
submit to a criminal background check and a drug screening.  Stacy tested positive for cocaine and
admitted that she and Michael had smoked crack cocaine together and that they
had most recently used two days prior to coming to the shelter. CPS
investigators came and removed D.E.P. from the shelter, and additional
investigators went to the family=s hotel room and removed the other three children.  

Even though the children were
removed in October 2006, the parents failed to make visits until January
2007.   Stacy claimed that she and
Michael could not make the visits in Fort Worth because they lived in a hotel
in Arlington and they had no transportation. 
Michael stated that he and Stacy could not move to a hotel in Fort Worth
because it would cost too much money and because they did not have transportation
to get there.








CPS created a service plan
for Stacy and Michael after the removal, but Shawna Wells, a CPS caseworker,
was unable to deliver it to the parents at that time because she could not
locate them.  Wells personally delivered
the service plan to the parents in January 2007.  Neither parent had completed their services
as of the time of the trial in August 2007. 
Both parents continued to use drugs after the removal of the children,
but they testified that they had last used cocaine in April 2007.  The family=s living situation had not improved since the removal.  Stacy stated that she had recently stayed at
a free shelter in Parker County, but the shelter asked her to leave for failure
to complete her chores on time.  Stacy
and Michael then began living out of their car. 
And in fact, the couple stayed in their car the night before trial, but
on the first day of trial, the car was repossessed from the courthouse parking
lot. After hearing evidence on August 14
and 16, 2007, the trial court granted the petition of the Department of Family
and Protective Services (DFPS) to terminate Stacy=s and Michael=s parental rights.  The trial court found by clear and convincing
evidence that Stacy and Michael knowingly placed or knowingly allowed the
children to remain in conditions or surroundings which endangered the physical
or emotional well-being of the children, and that Stacy and Michael engaged in
conduct or knowingly placed the children with persons who engaged in conduct
which endangered the physical or emotional well-being of the children.  See Tex.
Fam. Code Ann. ' 161.001(1)(D),
(E) (Vernon Supp. 2007).  The trial court
also found by clear and convincing evidence that the termination of Stacy=s and Michael=s parental
rights was in the children=s best interest.  See
id. ' 161.001(2).

III. Motion for Extension








Before DFPS called its first
witness, Michael=s attorney made
an oral motion for an extension of time so that both parents could comply with
the service plan.  The attorney argued in
support of the motion that the parents had obtained transportation so that they
could start completing their services, that they had been clean from drug use
since April 2007, and that they were ready to move into an apartment.  He also mentioned that the children wanted to
go home with their parents.  Michael=s main argument before the trial court was that the service plan given
to the parents was deficient.  He stated
that while the top of service plan properly addressed the parents as AStacy [K.]@ and AMichael [P.],@ the body of
the service plan referred to Michael P. as AMr. [K.].@  Thus, he argued that the service plan was not
specific enough to apprise Michael of the services that he was required to
complete.  See Tex. Fam. Code Ann. ' 263.102 (Vernon 2002). 
The trial court denied the motion, and Michael now argues in his first
issue that the trial court erred by denying the request.  See id. ' 263.401(b) (Vernon Supp. 2007).








We review a trial court=s determination on a motion for extension for an abuse of
discretion.  In re D.W., 249
S.W.3d 625, 647 (Tex. App.CFort Worth 2008, pet. denied) (en banc).  Section 263.401 of the Texas Family Code
provides that, unless the court has commenced the trial on the merits or
granted an extension, it must dismiss DFPS=s suit for termination on the first Monday after the first anniversary
of the date the court appointed DFPS as temporary managing conservator in a
suit affecting the parent‑child relationship.  Tex.
Fam. Code Ann. ' 263.401(a).  The statute also provides that the trial
court may extend this deadline for up to 180 days if the court finds that
extraordinary circumstances necessitate the child remaining in the temporary
managing conservatorship of the DFPS and that continuing the appointment of
DFPS as temporary managing conservator is in the best interest of the
child.  Id. ' 263.401(b).

The attorney ad litem for the
children did not oppose the motion.  She
stated, however, that her stance had nothing to do with whether the parents
knew what services they were to completeCin fact, she stated that in her conversations with the parents they
were both Avery aware@ of what services they each needed to completeCbut was instead based on her role as a child-directed attorney and the
fact that the three older children would agree to an extension because they
would rather be with their parents.  She
went on further to say that AI don=t have any
argument that [Michael] had no idea what he was supposed to do. [Michael] was
clear what services he was supposed to do. 
He and I have discussed those services.@  DFPS argued that a CPS
caseworker had personally delivered to the parents letters regarding the
services and that the parents had had plenty of opportunities to work on the
services prior to trial.








Despite the manner in which
the service plan was drafted, the statements by DFPS=s attorney regarding the letters and by the attorney ad litem regarding
Michael=s knowledge of the services suggest that Michael did in fact have
knowledge of the services that he needed to complete.  There was no testimony in support of this
motion from either parent regarding their knowledge of the services or what
services they had completed.  Based on
the arguments and statements presented to the trial court, it was entirely
within the trial court=s discretion
to determine that Michael had failed to present any extraordinary circumstances
that would necessitate an extension.  See
Shaw v. Texas Dep=t of Family
& Protective Servs., No. 03-05-00682-CV,
2006 WL 2504460, at *8 (Tex. App.CAustin Aug. 31, 2006, pet. denied) (mem. op.) (not designated for
publication) (holding that the appellant had not shown that needing more time
after failing to make progress on the service plan for eight months amounted to
Aextraordinary circumstances@ that necessitated the granting of the continuance).  Thus, we hold that the trial court did not
abuse its discretion, and we accordingly overrule Michael=s first issue.

IV. Sufficiency Arguments








In his second issue, Michael
argues that the evidence is legally and factually insufficient to support the
trial court=s findings
that he endangered the children=s welfare according to sections 161.001(1)(D) and (E) of the Texas
Family Code.  See Tex. Fam. Code Ann. ' 161.001(1)(D), (E).  He
also challenges the factual sufficiency of the evidence regarding the trial
court=s best interest finding.  See
id. ' 161.001(2).  In her two
issues, Stacy argues that the evidence is legally and factually insufficient to
support the trial court=s best
interest finding.  See id.

A.     Standards of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758B59, 102 S.
Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d
17, 26 (Tex. 2002).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20B21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the fact-finder resolved any
disputed facts in favor of its finding if a reasonable fact-finder could have
done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.








In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d
105, 108 (Tex. 2006).  We must determine
whether, on the entire record, a fact-finder could reasonably form a firm
conviction or belief that the parent violated a provision of section 161.001(1)
and that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.

B.     Endangerment Findings








The trial court may order termination of the parent-child
relationship if it finds by clear and convincing evidence that the parent has
engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangers the physical or emotional well-being of the child.  Tex.
Fam. Code Ann. ' 161.001(1)(E).  Endangerment is defined as exposing to loss
or injury, to jeopardize.  In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort Worth 2003,
no pet.).  Under subsection (E), the
relevant inquiry is whether evidence exists that the endangerment of the child=s physical or
emotional well-being was the direct result of the parent=s conduct,
including acts, omissions, and failures to act. 
Id.  Termination under
subsection (E) must be based on more than a single act or omission; a
voluntary, deliberate, and conscious course of conduct by the parent is
required.  Id.  However, it is not necessary that the parent=s conduct be
directed at the child or that the child actually suffer injury.  Boyd, 727 S.W.2d at 533. The specific
danger to the child=s well‑being may be inferred from
parental misconduct standing alone.  Id.

To determine whether termination is necessary, courts may
look to parental conduct both before and after the child=s birth.  In re R.W., 129 S.W.3d 732, 738 (Tex.
App.CFort Worth 2004,
pet. denied).  As a general rule, conduct
that subjects a child to a life of uncertainty and instability endangers the
physical and emotional well‑being of a child.  Id. at 739.  Drug use and its effect on a parent=s life and his
ability to parent may establish an endangering course of conduct.  Id. 
Further, while mere imprisonment, alone, will not constitute a course of
conduct that endangers the emotional or physical well‑being of a child,
it is a factor to be considered in the determination.  See Boyd, 727 S.W.2d at 533B34.








The evidence demonstrates that Michael has had issues with
substance abuse both before and after CPS removed the children.  Michael began using cocaine at some point in
2005 after Stacy=s relapse in 2004.  The couple in fact used a portion of Michael=s disability check
to pay for the cocaine.  Michael
testified that Abefore this happened,@ referencing the
removal of the children, he had used drugs only four or five times.  Bethany Hooser, a CPS investigator, testified
without objection, however, that Michael admitted to her co-worker on the night
of the removal that he Aused daily.@  Michael also stated that he had not used
drugs for two weeks prior to the removal, but again, this is contrary to Hooser=s testimony that
Stacy had told her on the night of removal that the couple had smoked crack
only two days before the removal.








CPS did not ask Michael to take a drug test on the night of
the removal, but later, in January 2007, Shawna Wells, a CPS caseworker, asked
Michael to take a drug test, which he refused. 
He refused for fear that he would miss an appointment at the shelter and
potentially risk not having a place to live. Michael told Wells that he quit
using drugs in April 2007, six months after CPS removed the children.  Wells again asked Michael to submit to a drug
test.  He complied and took a hair
follicle test on May 17, 2007.  Wells
reported to Michael, according to his testimony, that the test revealed that he
had been using Aday and night.@  And in fact, Wells testified that because of
the Ahigh volume@ in his drug test,
she encouraged him to go into inpatient treatment. Wells even offered to drive
Michael to inpatient treatment, but he refused and told Wells that he did not
need inpatient treatment and that his meetings with Narcotics Anonymous (NA)
were sufficient.

Michael testified that he attempted to enter CATS, an
outpatient drug treatment program, but that the program would not admit him
because the results from a second drug test showed that he had been Aclean too long.@ Wells contacted
the CATS program and found out that he had not met with a representative at the
program for treatment.

Although Michael maintained that he quit using cocaine in
April 2007, the evidence shows that Michael has had trouble in the past
remaining sober even after he completed treatment in Harris County for his
alcohol abuse.  Given his history with
substance abuse and in particular the fact that he used drugs for six months
while the case was pending, the trial court could have inferred that Michael=s substance abuse
issues would likely recur and further jeopardize the children=s well-being.  See R.W., 129 S.W.3d at 741. 








There is additional evidence demonstrating a history of
arrests.  Michael served time after he
was arrested for breaking into a house in Michigan. Michael rebutted this by
saying that this incident occurred in the 1970s when he was Aa kid.@  While living in Arkansas, Michael served
three months in county jail for domestic violence, but Michael contends that
the State released him early because a blood test revealed that someone had
spiked his drink with Visine, causing him to go Acrazy@ and Acompletely nuts.@  In Harris County, Michael served three days
for driving on a suspended license.   And
most recently, after CPS removed the children, Michael was arrested for
stealing three cases of beer and spent two weeks in jail for theft.  Michael stated that he had intended to sell
the beer so that he could pay for a motel room. 
The State then released Michael on bond, but he was rearrested shortly
after his release for failing to appear at a hearing because he lacked
transportation.      While some of these incidents are isolated and in the distant
past, the most recent incident involving theft and the subsequent arrest for
failing to appear occurred while the current suit was pending.  The trial court was entitled to take that
into consideration along with Michael=s drug use in
determining whether Michael had engaged in a course of conduct that endangered
the emotional or physical well‑being of the children.  See Boyd, 727 S.W.2d at 533B34. 








Viewing the evidence in the light most favorable to the
judgment, we conclude that the evidence is such
that a fact-finder could reasonably form a firm belief or conviction that
Michael engaged
in conduct or knowingly placed the children with persons who engaged in conduct
that endangered the physical or emotional well-being of the children.  See Tex.
Fam. Code Ann. ' 161.001(1)(E); J.P.B., 180 S.W.3d at 573.  Thus, the evidence is legally sufficient to
support the trial court=s findings
under section 161.001(1)(E).  Further,
when considering the entire record, we hold that a fact-finder could reasonably
form a firm conviction or belief that Michael violated section 161.001(1)(E).  And while there is conflicting evidence
regarding the extent of Michael=s drug use, the trial court, as the fact‑finder, enjoys the
right to resolve conflicts within the evidence. 
See In re T.N., 180 S.W.3d 376, 382 (Tex. App.CAmarillo 2005, no pet.).  The
trial court could have freely chosen to believe all, part, or none of the
testimony espoused by any particular witness. 
Id.; see also R.W.,129 S.W.3d at 742 (stating that
the fact‑finder=s function Ais to judge the credibility of the witnesses, assign the weight to be
given their testimony, and resolve any conflicts or inconsistencies in the
testimony@).  The disputed evidence that a reasonable
fact-finder could not have credited in favor of the finding is not so
significant that a fact-finder could not reasonably have formed a firm belief
or conviction in the truth of its finding.  See
H.R.M., 209 S.W.3d
at 108.  Accordingly, the evidence is also factually
sufficient to support the trial court=s finding that
Michael violated section 161.001(1)(E).








Because we have held that the evidence is legally and
factually sufficient to support the trial court=s finding under
section 161.001(1)(E), we need not address whether the evidence is sufficient
to support the finding under section 161.001(1)(D).  See R.W., 129 S.W.3d at 744 (stating
that only one finding under section 161.001(1) is necessary to support a
judgment of termination).

C.      Best Interest Findings

In his third point, Michael argues that the evidence is
factually insufficient to support the trial court=s best interest
finding.  Likewise, Stacy argues in two
points that the evidence is legally and factually insufficient to support the
trial court=s best interest finding.  Because the evidence is largely the same for
the analysis of both Michael=s and Stacy=s points, we will
consolidate our review.

Prompt and permanent
placement of the child in a safe environment is presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include the following:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 








(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371B72
(Tex. 1976).  These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

 

Evidence of a parent=s unstable lifestyle can also support a fact-finder=s conclusion that termination is in the child=s best interest. In re M.R., 243 S.W.3d 807, 821 (Tex. App.CFort Worth 2007, no pet.).  A
parent=s drug use, inability to provide a stable home, and failure to comply
with a family service plan support a finding that termination is in the best
interest of the child.  Id.








Stacy testified that the
children want to come home and that they are happy at home.  Wells also stated that the children love
their parents.  But even taking this
factor into consideration, there is ample evidence to support the trial court=s finding that the termination of parental rights is in the children=s best interest.

The most salient evidence
presented at the hearing concerned the parents= drug abuse before and after the children were removed.  Michael=s drug history is detailed above, and Stacy has had an even longer,
more troubling history with cocaine abuse, dating back to her time in Harris
County when her children were first removed by CPS because S.D.P. had tested
positive for cocaine.  After CPS
initially removed the children, Stacy entered a rehabilitation program but
later relapsed in 2004.  At trial, Stacy
maintained that she had never used drugs in front of her children but that she
instead used drugs in the bathroom of the hotel room while the children were
asleep.  Stacy admitted to using crack
often.








Stacy attended CATS meetings
but was eventually discharged based on her nonattendance.  She testified that she did not want to quit
but that she had no transportation to get to the meetings.  Stacy had also gone to Step One and NA
meetings to help her with her rehabilitation. 
However, like Michael, Stacy refused to go to inpatient drug treatment
at CPS=s request, even though Wells offered to drive her to the
facility.  Both parents admittedly used
drugs after CPS removed the children, but they both claim to have quit using as
of April 2007.  As we stated above, the
trial court was entitled to infer that the parents= drug abuse might continue in the future and endanger the children=s well-being.  See R.W.,
129. S.W.3d at 741.

Stacy argues that while the
evidence demonstrates that she had problems with drug abuse, Athe best interest finding lacks a firm factual basis apart from the >offending behavior,= [which Stacy] has affirmatively corrected.@  We disagree given the
following evidence presented at trial.

Stacy and Michael are not
currently employed.  Michael worked a few
odd jobs but stated that he had not worked since December 2004 or January
2005.  Michael asserted at trial that he
could not find employment in his profession as a welder because of the injuries
he suffered after performing a plumbing job. 
He also stated that he had tried unsuccessfully to find work for two
weeks as a day laborer in Arlington, Texas. 
Stacy, on the other hand, has not been employed since coming to Tarrant
County.  She testified that she had
applied at Kroger and Wal-Mart but that no one had hired her.  For income, she relies on $1,800 that L.D.K.,
M.L.P., and S.D.P. receive for their medical issues.  Stacy is waiting on MHMR to turn in her
paperwork so that she can also receive a disability check for her depression
and bipolar disorder.








The evidence regarding the
family=s instability is particularly troubling given the emotional and
physical needs of the children.  L.D.K. has
been diagnosed with bipolar disorder, learning disorder, mathematics disorder,
and sibling-relations disorder.  Wells
reported that while L.D.K. still has issues, he is doing much better since he
has been in CPS=s care.  M.L.P. has been diagnosed with bipolar
disorder, attention deficit hyperactivity disorder (ADHD), and phonological
disorder.  S.D.P. has been diagnosed with
ADHD, nocturnal and diurnal enuresis, provisional phonological disorder,
developmental coordination disorder, and mild mental retardation.

Stacy stated that she had
taken L.D.K. and M.L.P. to MHMR for help with their bipolar disorders and that
MHMR eventually came out to visit Stacy and Michael at their hotel room to work
on parenting skills for children with special needs.  Wells testified that while the children love
their parents, they are very high maintenance, and the parents do not have the
ability to care for the children. 
L.D.K., M.L.P., and S.D.P. are all at least a grade level behind, and
Wells went as far as to say that they were Aextremely behind.@  Wells also testified that the
children were behind socially but that they have made Aextreme progress@ in areas
dealing with behavior and appropriate social boundaries.  Wells testified that D.E.P. was not behind
developmentally when CPS took custody of him but that he is not talking as much
as he should.








Stacy attempted to home
school the children in the 2005B2006 year, but she eventually realized that A[she] didn=t know what
[she] was doing.@  The next year, the children started school
late because the school would not accept them without their proper
medications.  Stacy claimed that
initially she could not afford the medications because she had to use the
monthly checks that the children received for their medications to pay for a
hotel room.  Stacy claimed that the
children were taking their medications daily when they were removed.

Lallay T., the foster parent
of S.D.P. and M.L.P., testified that when S.D.P. first came to her house at age
five, she still wore diapers, her fine motor skills were extremely slow, and
she could not put on any item of clothing. 
She stated that as of the time of trial, S.D.P. could still not open a door
or eat with a fork.  Lallay observed
M.L.P. and S.D.P. go up to complete strangers and beg for food.  She also observed both children
inappropriately use toys in a sexual manner.

The children=s coordinator at the Arlington Life Shelter recalled that D.E.P. was Apretty dirty@ on the
night of the removal.  Hooser remembered
the other children being Asomewhat
dirty [and] unkempt@ when CPS
removed them from the hotel room, which Michael disputes, stating that the
children had brand new clothes on when CPS removed them.  Further, Lallay said that when S.D.P. and
M.L.P. first arrived at her house, they were Atotally infested@ with lice.








There is also evidence
demonstrating that the parents failed to complete their service plan, which included,
among other things, parenting classes, drug assessments, bipolar and ADHD
education classes, and counseling sessions. 
Stacy said that she had completed a psychological evaluation through
MHMR but not through the doctor CPS requested. 
Stacy said that she had tried to contact the doctor that CPS provided
but that no one called her back.  In
fact, Stacy said that she had called the doctor every day from January until
the trial in August.  Stacy testified
that she had not completed her education classes and that she had not gone to
TCADA for her drug abuse.  Wells
testified that the parents had not completed the requested psychological
evaluations or parenting classes.








Michael argues that because
the service plan referred to Michael P. as AMr. [K.]@ in the body
of the document that Michael did not know what services he was required to
complete.  Michael maintained at trial
that he had never received a copy of the service plan or Aany paperwork@ that Wells
claimed she had personally delivered to the parents.  He later stated, however, that he Anever denied knowing that [he] needed services@ but that Wells had explained to him that all he had to do was
participate in drug rehabilitation, attend parenting classes, and take a
psychological evaluation.  Michael said
that he Atried to@ complete
drug rehabilitation, completed his psychological evaluation through MHMR, and
attended one parenting class before losing transportation.  

Contrary to Michael=s testimony that he was unaware of what services he had to complete,
Wells stated that in January 2007, she personally delivered the service plan to
the parents along with a letter that was more specific with addressees and
phone numbers of the facilities where the parents could complete the services.  Wells also testified that before she visited
the parents, she had called them on the telephone to go over the service
plan.  Wells said that she was Avery, very specific@ about what was expected of the parents and where they had to go to
complete their services.  Wells stated
that the parents understood that they were receiving a service plan, that they
told her that they would work services, and that they wanted to do everything
they could to regain custody of their children.








Regarding placement after
termination, DFPS plans to find adoptive homes for all the children.  None of the current foster parents were
dual-licensed as of the time of trial, although Lallay showed an interest in obtaining
a dual-license.  Wells testified that if
Stacy=s and Michael=s parental
rights were terminated that DFPS could Aabsolutely@ find an
appropriate adoptive home for the children. 
When the children were initially removed, some of the children were
placed in separate homes,[3]
but Wells stated that it is DFPS=s policy to first try to find a home for all four children after
termination.  Nicole Batson, a licensed
professional counselor, provided therapy for M.L.P. and S.D.P. and stated that
the girls need consistency and structure, that they have probably not had much
stability given their struggles with small tasks, and that they both have an
ability to move on and bond with a new family. 
Wells echoed these thoughts and stated that the children were adoptable
and able to move on to a new life.








Conversely, Michael and Stacy
have shown little ability to provide a stable environment for the children if
they were returned.  Before the removal,
the family lived in multiple hotels and shelters.  Stacy stated that she had recently stayed at
a free shelter in Parker County but was asked to leave for noncompliance with
shelter rules.  Michael at one point
stole beer from a convenience store so that he could sell it and pay for a
hotel room.  Eventually the couple lived
out of their car, which was repossessed on the first day of trial. There was
testimony that the family was looking to find an Aall bills paid@ apartment,
but the family had not yet found such a place. 
The parents claimed that they had not been able to get housing before
because they were making car payments and paying for car maintenance, but Stacy
stated that she could find a place in the next few weeks after the trial, once
the next check arrived.  Stacy applied to
Shelter Plus but missed her appointment with the housing representative.  She claimed that she had not been able to get
in contact with anyone at Shelter Plus to set up another appointment.  

Finally, Stacy testified that
the children could possibly live with Michael=s sister in Michigan even though she had not informed her attorney
about this possibility as of the time of trial. 
Michael stated that he had not even spoken to his sister.  Stacy maintained that she and Michael had
informed Wells about the children=s aunt, but Michael testified that he had only told Wells the day
before trial.  There is little testimony
in the record about the aunt other than she apparently does not have a criminal
history and has two older children.








We acknowledge the hardship
that a family faces when displaced from a home because of a natural disaster
such as a hurricane, but Stacy and Michael have had ample time to try to find
employment, find housing, and improve their overall living conditions.  As noted by DFPS, through the course of the
case, Stacy and Michael have received services and benefits from CPS, SSI,
MHMR, and FEMA, but the family has not been able to utilize those services to
provide a stable and consistent life for their children.  After reviewing the entire record, we hold
that the evidence is both legally and factually sufficient to support the trial
court=s finding that the termination of Stacy=s and Michael=s parental
rights is in the children=s best
interest.  Accordingly, we overrule
Michael=s third issue and both of Stacy=s issues.

IV. Conclusion

Having overruled all of
Michael=s and Stacy=s issues, we
affirm the trial court=s judgment.

 

 

PER CURIAM

 

PANEL
F:  HOLMAN, J.; CAYCE, C.J. and
LIVINGSTON, J.

 

DELIVERED:  July 31, 2008











[1]See Tex. R.
App. P. 47.4.





[2]D.E.P. had not been born at this
time.





[3]L.D.K. was initially placed in a
separate foster home because he sexually Aperpetrated@ S.D.P. when the children were temporarily living in a
shelter.  CPS separated D.E.P. from the
other children for his protection because M.L.P. and S.D.P. had Aperpetrated@ on him.